**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 4:20CR058 SEP/NAB |
| v. | ) |
| | ) |
| ANTONIO TAYLOR, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Before the Court is Defendant Antonio Taylor's Motion to Suppress Evidence and Statements.[1] (Doc. 54.) The United States filed a response. (Doc. 58.)  On August 25, 2021, the undersigned held an evidentiary hearing.  At the hearing the Court heard testimony from witnesses and received exhibits into evidence.  Following the hearing, a transcript was prepared (Doc. 81) and the parties filed post hearing briefs. (Docs. 83, 88, 92.)  After reviewing the transcript and considering the post hearing briefs, the undersigned ordered a supplemental hearing be held to consider the Fourth Amendment issues before the court. (Doc. 93.)  The supplemental hearing was held on March 17, 2022. (Doc. 95.)  Following the supplemental hearing, the parties filed post hearing briefing. (Docs. 102, 103.)  On April 14, 2022, Mr. Taylor filed a notice that no reply brief would be forthcoming. (Doc. 104.)

Having heard and fully considered the testimony and evidence presented, and in full consideration of the parties' arguments and the relevant case law, and for the reasons stated below,

---

[1] All pretrial motions in the above cause were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

the undersigned recommends that the Court deny Mr. Taylor's Motion to Suppress Evidence and Statements.

## I.     PROCEDURAL BACKGROUND

On January 22, 2020, a five-count indictment was returned against Mr. Taylor.  He is charged in Count One with being a felon in possession of a firearm on December 13, 2019, in violation of 18 U.S.C. § 922(g)(1); in Count Two he is charged with possession with the intent to distribute heroin, a schedule I controlled substance, on January 15, 2020 in violation of 21 U.S.C. § 841(a)(1); in Count Three he is charged with a possession with the intent to distribute cocaine base, a schedule II controlled substance, on January 15, 2020, in violation of 21 U.S.C. § 841(a)(1); in Count Four, he is charged with one count of possession of a firearm in furtherance of a drug trafficking crime on January 15, 2020, in violation of 18 U.S.C. § 924(c); and in Count Five he is charged with being a felon in possession of a firearm on January 15, 2020, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1.)

The undersigned took up Mr. Taylor's suppression motion at the August 25, 2021 evidentiary hearing.[2]  Mr. Taylor was present with his attorney Assistant Federal Defender Kayla Williams, and the government was represented by Assistant United States Attorney Donald Boyce.  The government presented three witnesses, FBI Special Agent Owen Cunningham, St. Louis County Police Detective Derek Machens, and Secret Service Special Agent Jason Davis.  Mr. Taylor presented the testimony of two St. Louis County Police Detectives, Randall White and Serif Sadikovic.

The witnesses testified generally about the methods used to locate and arrest Mr. Taylor on January 15, 2020.  He was located when officers first used precision location information supplied by the cell phone service provider and then employed a cell site simulator.  Officers did not procure

---

[2] Defendant filed several *pro se* motions (Doc. 60) on May 25, 2021.  At the evidentiary hearing, his counsel told the Court that he would not be proceeding on the *pro se* motions.  Therefore, those motions will be denied as moot.

warrants before using these techniques and Mr. Taylor contends this amounted to a violation of his Fourth Amendment rights.

At the supplemental hearing, the Court heard arguments of counsel regarding the warrantless search of Mr. Taylor's cell site location information and the Fourth Amendment implication of that search. In addition, the Government presented additional testimony from S/A Davis who testified about the use of the cell site simulator to locate Mr. Taylor and the Department of Homeland Security policy regarding the use of this technology.

## II.   FACTUAL FINDINGS

Officers testified that Mr. Taylor was taken into custody because he was wanted for questioning regarding a September 2019 murder, an incident on December 13, 2019 and a flourishing of a weapon on January 9, 2020. On January 13, 2020, St. Louis County Police Homicide Detective Serif Sadikovic entered a wanted for Mr. Taylor for a murder which occurred in September 2019. The wanted was entered after a witness identified Mr. Taylor as the murderer. Mr. Taylor is also accused of a December 13, 2019 assault. That day, a man backed into Mr. Taylor's car in the parking lot of a liquor store. In response, Mr. Taylor allegedly pointed a gun at the man and took approximately $400.00 from him. He is also accused of taking a gun from the man. Mr. Taylor later contacted the Berkeley, Missouri Police Department and arranged to return the firearm he had taken from the victim. Count One of the instant case is based on the December 13, 2019 incident. (Doc. 81, August 25, 2021 Transcript, Tr. 7-9.)

On January 9, 2020, Mr. Taylor was identified by a witness as having leaned out of a vehicle window and pointed an AK-47 style rifle at a person in Berkeley. The Berkeley Police Department responded to the incident and identified Mr. Taylor as the driver of a truck. At that point, there was an extended police pursuit of Mr. Taylor. Mr. Taylor escaped from officers on foot and drug

paraphernalia was located in the vehicle Mr. Taylor was driving.  The officer pursuing Mr. Taylor observed him fleeing with the assault style rifle in his possession.  A wanted was issued for Mr. Taylor following this incident. (Tr. 9-11.)

On January 15, 2020, an officer from the Berkeley Police Department reported that Mr. Taylor had called the department the previous evening demanding a charger for the ankle monitor that Mr. Taylor was wearing as a condition of his state probation.  Special Agent Cunningham learned this information from a canine officer who did not actually speak to the caller.  S/A Cunningham stated that "there was a cascade of calls that the defendant made to Berkeley demanding a charger be brought to him for his ankle monitor."  In addition, Mr. Taylor is reported to have stated that he would "wreak havoc" if he did not receive the charger.  However, the Berkeley Police Department does not have any recordings of the calls. (Def. Exh. C)   The testimony regarding the alleged calls to the Berkeley Police Department, involves hearsay upon hearsay.  Special Agent Owens testified that he received a call from Canine Officer Sean Hendel at the Berkeley Police Department. (Tr. 13, 27.) Officer Hendel told S/A Owens that Mr. Taylor made "a cascade of calls" to the Department's nonemergency number demanding a charger for his ankle bracelet.  (*Id*. at 28.) Officer Hendel did not speak to the caller, therefore he was relaying information from an unknown source.  S/A Owens admitted that there is no recording of the calls and that the information was not relayed to him until the morning of January 15, 2020 when the decision had already been made to attempt to apprehend Mr. Taylor. (*Id*. at 28-30.) In addition, Mr. Taylor submitted AT&T call records for his telephone as Defendant's Exhibit B.  Those call records indicate that no outgoing calls were made from Mr. Taylor's telephone number to the Berkely Police Department on January 14, 2020.  Therefore, there is no credible evidence that Mr. Taylor actually called the police department and made those threats. It is also not credible that trained police officers would rely on a telephone number left by a caller with "someone"

-4-

at a police department as the number of the person they were seeking to arrest.  Officers were able to locate previous addresses for Mr. Taylor through probation and parole, and it is highly likely that probation and parole would have had his telephone number.

On the morning of January 15, 2020, an arrest team made up of St. Louis County Detectives who are also FBI Task Force Officers attempted to arrest Mr. Taylor.  They began looking for Mr. Taylor at about 9:00 in the morning.  They determined that Mr. Taylor had a probation violation warrant and that he was wanted for questioning in the September 2019 homicide.  Officers attempted to find Mr. Taylor at three different addresses they had for him.  However, by mid-day, they were unable to locate him.   After failing to find him at a residence, they checked his social media accounts and were unable to locate him.

Having failed to find Mr. Taylor, a decision was made to track his cell phone to locate him. Detective Machens contacted AT&T and requested "exigent real time location pings" of the phone number that the Berkeley Police Department had identified as Mr. Taylor's number. (Tr. 37.) The process of getting the exigent information involves calling the carrier and faxing a form with the target number on it.  The officer also provides an email address which is used to receive the location information. Det. Machens explained that they did not get a search warrant because, "based on the information we had, we believed that that was exigent to locate him, that he was a risk, not only to the community as a whole, but law enforcement as well due to the recent phone call and his actions." (Tr. 40.) Det. Machens stated that after employing exigent circumstances phone location, the department practice is to get a follow-up warrant with the court to show officers were acting in good faith and had probable cause at the time to believe the phone was being carried by this individual and that if not for time constraints they would have gone through the normal process to get a warrant.  A

follow-up warrant was obtained on January 22, 2020, one week after the location information was procured, and was introduced as Government's Exhibit 1.

AT&T provided the location information in the form of emails every 15 minutes. The information officers received from the carrier was precise within 70 to 80 meters and it indicated that Mr. Taylor's phone was moving around. Officers were still unable to locate Mr. Taylor so they called Special Agent Davis to request the use of a cell site simulator to locate Mr. Taylor. (Tr. 37-38.)

S/A Davis received a call from the St. Louis County Police Department stating that they were looking for an individual that was wanted for homicide. They told him they had precision information from the phone company for the area where the phone was located. They also provided the cell phone number he needed to be able to search for the phone with his equipment. (Tr. 67-68.)

At some point in the afternoon S/A Davis arrived with the cell site simulator and using the technology was able to locate Mr. Taylor's cell phone. S/A Davis described how the cell site simulator operates. It is a mobile device that simulates a standing cell phone tower for the target phone. The simulator pulls the target phone's signal that would otherwise go to a standing tower, and the signal instead goes to the simulator. The device does not monitor cell phone calls, voicemails or text messages. (Tr. 66-69.)

S/A Davis put the identifier information into his machine and once he was in the area that the precision location information had indicated the phone was located, he deployed the cell site simulator. Near the intersection of Page and Woodson, he was able to lock on to the cell phone signal. Eventually, he located the device at a Captain D's restaurant at the intersection of Page and Woodson. After driving around the restaurant parking lot, he determined that the phone was in a car in the drive through lane of the restaurant. He looked in the car and saw a driver and an individual in the back seat. S/A Davis then contacted the arrest team and described the vehicle, its location, and

the number of people in the vehicle. The arrest team then converged on the vehicle and took Mr. Taylor into custody.  (Tr. 70-73.)

Mr. Taylor was removed from the vehicle, handcuffed and placed in a van.  An officer searched the vehicle and found two firearms and drug evidence. Agent Cunningham was with Mr. Taylor as the items were being removed from the vehicle. As the guns and drugs were being removed, Mr. Taylor made the statement, "Ain't nothing in that car that lady's."  Mr. Taylor had not received Miranda warnings when he made the statement, however, he had not been questioned by officers.

## III.    DISCUSSION, CONCLUSIONS OF LAW, AND RECOMMENDATIONS

Mr. Taylor seeks to suppress evidence seized and statements made following his arrests on January 15, 2020.  He contends the warrantless acquisition of the cell site location information (CSLI) from AT&T and the use of the cell site simulator violated the Fourth Amendment and contravened Department of Justice policy.  The United States counters that the warrantless search of Mr. Taylor's cell phone location information was based on exigent circumstances and that statements Mr. Taylor made were not the result of interrogation.

The undersigned will first address issues related to CSLI and cell site simulators as used in this particular case.

### A.  Technological Considerations

#### 1.  Cell Site Location Information (CSLI)

In *Carpenter v. United States*, the United States Supreme Court described how cell site location information (CSLI) is procured:

> Cell phones perform their wide and growing variety of functions by connecting to a set of radio antennas called "cell sites." Although cell sites are usually mounted on a tower, they can also be found on light posts, flagpoles, church steeples, or the sides of buildings. Cell sites typically have several directional antennas that divide the covered area into sectors.

Cell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site. Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features. Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI). The precision of this information depends on the size of the geographic area covered by the cell site. The greater the concentration of cell sites, the smaller the coverage area. As data usage from cell phones has increased, wireless carriers have installed more cell sites to handle the traffic. That has led to increasingly compact coverage areas, especially in urban areas.

Wireless carriers collect and store CSLI for their own business purposes, including finding weak spots in their network and applying "roaming" charges when another carrier routes data through their cell sites. In addition, wireless carriers often sell aggregated location records to data brokers, without individual identifying information of the sort at issue here. While carriers have long retained CSLI for the start and end of incoming calls, in recent years phone companies have also collected location information from the transmission of text messages and routine data connections. Accordingly, modern cell phones generate increasingly vast amounts of increasingly precise CSLI.

138 S. Ct. 2206, 2211–12, 201 L. Ed. 2d 507 (2018).

A cellular service provider may make CSLI data available to a governmental entity, "if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency." 18 U.S.C. § 2702(c)(4).

### 2.  Cell Site Simulators

"When powered on, a cell phone is (among other things) a radio transmitter that automatically announces its presence to a cell tower or 'cell site' via a radio signal over a control channel which does not itself carry the human voice." *United States v. Bermudez*, 2006 WL 3197181 at *6 (S.D. Ind. June 30, 2006) (citing *In re application for Pen Register and Trap/Trace device with Cell Site Location Authority*, 396 F.Supp.2d 747, 751 (S.D. Tex. 2005)). Generally speaking, when on (and not in airplane mode) a cell phone "is constantly seeking the best reception," and checking for cell tower/site, "regardless of whether a call is made." *Id*. (citing *In re Application of U.S. for an Order*

*Authorizing Installation and Use of a Pen Register and a Caller Identification System*, 402 F.Supp.2d 597, 599 (D. Md. 2005)). Cell phones are designed to seek, identify, and connect with the cell tower having the best signal in the area. *See Jones v. United States*, 168 A.3d 703, 709 (D.C. App. Ct. Sept. 21, 2017) (describing cell phone technology in the context of cell-site simulators); *see also United States v. Temple*, 2017 WL 7798109 at *5-7 (E.D. Mo. Oct. 6, 2017) (describing cell-site simulators in the context of phone location).

Although the Government has not conceded that a warrant (or a warrant exception) is always required to deploy and use cell-site simulator technology, in September 2015, it promulgated guidance which requires federal agents to meet a probable cause standard, in most circumstances, in order to use "Cell Site Simulator Technology." See Department of Justice Policy Guidance: Use of Cell Site Simulator Technology (Sept. 3, 2015), http://www.justice.gov/opa/file/767321/download. The Seventh Circuit has commented that, assuming the Department of Justice Policy Guidance is accurate—

> Cell-site simulators ... function by transmitting as a cell tower. In response to the signals emitted by the simulator, cellular devices in the proximity of the device identify the simulator as the most attractive cell tower in the area and thus transmit signals to the simulator that identify the device in the same way that they would with a networked tower.
>
> A cell-site simulator receives and uses an industry standard unique identifying number assigned by a device manufacturer or cellular network provider. When used to locate a known cellular device, a cell-site simulator initially receives the unique identifying number from multiple devices in the vicinity of the simulator. Once the cell-site simulator identifies the specific cellular device for which it is looking, it will obtain the signaling information relating only to that particular phone. When used to identify an unknown device, the cell-site simulator obtains signaling information from non-target devices in the target's vicinity for the limited purpose of distinguishing the target device.
>
> By transmitting as a cell tower, cell-site simulators acquire the identifying information from cellular devices. This identifying information is limited, however. Cell-site simulators provide only the relative signal strength and general direction of a subject cellular telephone; they do not function as a GPS locator, as they do

not obtain or download any location information from the device or its applications. Moreover, cell-site simulators used by the Department must be configured as pen registers, and may not be used to collect the contents of any communication, in accordance with 18 U.S.C. § 3127(3). This includes any data contained on the phone itself: the simulator does not remotely capture emails, texts, contact lists, images or any other data from the phone. In addition, Department cell-site simulators do not provide subscriber account information (for example, an account holder's name, address, or telephone number).

*United States v. Patrick*, 842 F.3d 540, 542-43 (7th Cir. 2016) (quoting Department of Justice Policy Guidance: Use of Cell Site Simulator Technology (Sept. 3, 2015) at 2), cert. denied, 138 S. Ct. 2706 (2018). *See also United States v. Johnson*, No. S1418CR5651CDPJMB, 2020 WL 6049562, at *13–14 (E.D. Mo. Apr. 14, 2020), *report and recommendation adopted*, No. 4:18 CR 565 CDP, 2020 WL 3989590 (E.D. Mo. July 15, 2020).

### B. Analysis

#### 1. Validity of Warrantless Use of CSLI and Cell Site Simulator

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The "basic purpose of this Amendment," our cases have recognized, "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

For much of our history, Fourth Amendment search doctrine was "tied to common-law trespass" and focused on whether the Government "obtains information by physically intruding on a constitutionally protected area." *United States v. Jones,* 565 U.S. 400, 405, 406, n. 3, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012). More recently, the Court has recognized that "property rights are not the sole measure of Fourth Amendment violations." *Soldal v. Cook County,* 506 U.S. 56, 64, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). In *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court established that "the Fourth Amendment protects people, not places,"

and expanded their conception of the Amendment to protect certain expectations of privacy as well. *Carpenter,* 138 S. Ct. at 2213. When an individual "seeks to preserve something as private," and his expectation of privacy is "one that society is prepared to recognize as reasonable," courts have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause. *Id.* (quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 2580, 61 L. Ed. 2d 220 (1979)).

In *Carpenter v.  United States*, the Supreme Court applied these principles to hold that the collection of historical CSLI over the course of 127 days was a search within the meaning of the Fourth Amendment, and that the Government must "generally" obtain a warrant supported by a probable cause before acquiring such records. 138 S. Ct. at 2220.

Last year, the Seventh Circuit addressed the question that *Carpenter* left open: whether governmental collection of real-time CSLI constitutes a search under the Fourth Amendment. *United States v. Hammond,* 996 F.3d 374, 387 (7th Cir. 2021). In *Hammond,* the defendant was suspected of perpetrating a series of robberies. *Id.* at 380. After gathering information to identify Hammond as the lead suspect, state police requested CSLI from his cell service provider pursuant to 18 U.S.C. § 2702(c)(4), which authorizes the disclosure of customer records to governmental agencies in emergency circumstances. *Id.* at 381. A series of "pings" allowed officers to locate and pursue Hammond's vehicle, leading to his arrest and government seizure of contraband. *Id.* at 381-82.

Unlike "the 127 days of monitoring at issue in *Carpenter*," the Court reasoned, the officers' "monitoring of Hammond's location lasted only a matter of hours." *Id.* at 389. Moreover, the officers in *Hammond* "only collected location data that Hammond had already exposed to public view while he travelled on public, interstate highways and into parking lots within the public's view." *Id.* Notably also, the Court highlighted that "[l]aw enforcement used the real-time CSLI to

find Hammond's location in public, not peer into the intricacies of his private life." *Id.* The Court further noted that the officers did not use the CSLI "to examine the defendant's movements *inside of a home* or other highly protected area." *Id.* (emphasis added).

The Seventh Circuit in *Hammond* went on to distinguish *Carpenter* because of the "retrospective quality" of the information collected there, a characteristic which particularly concerned the Court. *Id.* at 389-90. "Real-time CSLI collected over the course of several hours," the Seventh Circuit asserted, "simply does not involve the same level of intrusion as the collection of historical CSLI." *Id.* at 390. Finally, the Court explained that while the historical CSLI collected in *Carpenter* "contravened society's expectations not only of their own privacy, but also of law enforcement's capabilities"; the officers' "ability to locate Hammond on public roads for a six-hour period using real-time CSLI is not inconsistent with society's expectations of privacy from law enforcement's prying eyes." *Id.* Thus, the court concluded that "the collection of his real-time CSLI was not a search." *Id.* at 392.

While the Eighth Circuit has yet to decide whether and under what circumstances the use of a Cell Site Simulator to locate a phone amounts to a "search," several other courts have recently considered the issue. For example, the Middle District of Pennsylvania distinguished the Seventh Circuit's *Hammond* opinion in determining that the ping of the defendant's cell phone constituted a Fourth Amendment search:

> Whereas the tracking in *Hammond* did not contravene society's expectation of privacy or law enforcement's capabilities, because it captured Hammond's location on a public road, the ping here located Defendant Baker in a private house. One's presence inside of a particular home is generally considered private, and society does not expect law enforcement to possess the capability of instantaneously locating citizens in a private space. *See Commonwealth v. Almonor*, 482 Mass. 35, 120 N.E.3d 1183, 1195 (2019) ("[S]ociety's expectation has been that law enforcement could not secretly and instantly identify a person's real-time physical location at will."). Although perhaps not as invasive as the comprehensive data collected in *Carpenter*, the discovery of one's presence inside a private home does

reveal "intricacies of private life." Personal associations, for instance, often take place within the walls of private dwellings, so even a snapshot of location information, reaching the target beyond the threshold of these walls, can provide an intrusive glimpse into his private affairs.

*United States v. Baker*, 563 F. Supp. 3d 361, 381 (M.D. Pa. 2021). Similarly, the District of Columbia Court of Appeals, the Northern District of California, and the Southern District of New York have each recently held that a person has a reasonable expectation of privacy in his or her real time cell phone location such that the use of a Cell Site Simulator to locate the cell phone is a search which would require a warrant or an exception to the warrant requirement. *See Jones v. United States,* 168 A.3d 703, 713 (D.C. 2017) (concluding that the use of a Cell Site Simulator to locate a suspect was a search under the Fourth Amendment); *United States v. Ellis,* 270 F. Supp. 3d 1134, 1146 (N.D. Cal. 2017) (relying on *United States v. Lambis,* 197 F. Supp. 3d 606 (S.D.N.Y. 2016) in finding that the use of the Stingray devices to locate Ellis's cell phone amounted to a Fourth Amendment search). In 2016, the Court of Special Appeals of Maryland held that a pen register and trap-and-trace order was insufficient to authorize the use of a Cell Site Simulator to locate a suspected murderer. *See State v. Andrews,* 134 A.3d 324, 349 (holding "that people have a reasonable expectation of privacy in real-time cell phone location information").

Here, the Government does not concede that that a warrant is needed for the CSLI, instead, the Government contends that even if a warrant was needed, both the request for cell phone GPS data (CSLI) and the use of the cell site simulator were lawful based on exigent circumstances. For purposes of deciding Mr. Taylor's Motion to Suppress, the undersigned will assume that the use of the CSLI and cell site simulator constitute a Fourth Amendment search.

Evidence derived from an unconstitutional search or seizure generally must be suppressed under the fruit-of-the-poisonous-tree doctrine. *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 3385, 82 L. Ed. 2d 599 (1984). When a defendant contends that the government conducted a

warrantless search, the government must show that the warrantless search was justified on other grounds. *See Coolidge v. New Hampshire*, 403 U.S. 443, 453, 91 S. Ct. 2022, 2031, 29 L. Ed. 2d 564 (1971), *holding modified on other grounds by Horton v. California*, 496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990).

### 2. Exigent Circumstances

Here, the Government contends that it obtained location data for Mr. Taylor's cell phone based on exigent circumstances, as authorized by statute. 18 U.S.C. § 2702(a)(3) states "a provider of remote computing service or electronic communication service…shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service…to any governmental entity." However, the statute provides for exceptions.  Specifically, 18 U.S.C. § 2702(c)(4) states a provider may divulge a record or other information to a governmental entity, "if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information related to the emergency." Using this provision, Detective Machens contacted AT&T to request realtime location pings of Mr. Taylor's phone.

"[E]ven though the Government will generally need a warrant to access CSLI, case-specific exceptions may support a warrantless search of an individual's cell-site records under certain circumstances." *Carpenter*, 138 S. Ct. at 2222. "One well-recognized exception applies when 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (internal quotations and citations omitted). "Such exigencies include the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence." *Id.* at 2223

(citing *Kentucky v. King,* 563 U.S. 452, 460, 131 S.Ct. 1849 (2011)). Courts "have approved warrantless searches related to bomb threats, active shootings, and child abductions." *Id.*

Likewise, the officers requested the use of the cell site simulator based on purportedly exigent circumstances.   The Department of Homeland Security Police Regarding the Use of Cell-Site Simulator Technology states, "An exigency that excuses the need to obtain a warrant may arise when the needs of law enforcement are so compelling that they render a warrantless search objectively reasonable."  The policy sets out the types of exigent circumstances that may justify dispensing with a warrant.   "These include the need to protect human life or avert serious injury; the prevention of the imminent destruction of evidence; the hot pursuit of a fleeing felon; or the prevention of escape by a suspect or convicted fugitive from justice."  (Exh. E.)

The exigent circumstances exception is applied on a "case-by-case basis," which requires courts to consider the "totality of circumstances." *Birchfield v. North Dakota*, 579 U.S. 438, 136 S.Ct. 2160, 2180, 195 L.Ed.2d 560 (2016); *Missouri v. McNeely*, 569 U.S. 141, 149, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013). Exigent circumstances include "danger to the lives of officers or others" or "the possibility that evidence may be removed or destroyed*." U.S. v. Anderson*, 644 Fed.Appx. 192, 194 (3d Cir. 2016) (internal citation omitted); *United States v. Hill,* 430 F.3d 939, 941 (8th Cir. 2005). "The common thread is imminence—the existence of a true emergency." *U.S. v. Mallory*, 765 F.3d 373, 384 (3d Cir. 2014) (internal quotation omitted). For example, the exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed. *United States v. Ball,* 90 F.3d 260, 263 (8th Cir. 1996) (citing *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978); *Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967); *and Ker v. California,* 374 U.S. 23, 42, 83 S.Ct. 1623, 1634, 10 L.Ed.2d 726 (1963)). The burden is on the

government to demonstrate that exigent circumstances justified the search, a burden which is "heavy." *Id.* (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749-50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984)).

Here, for the exigent circumstances exception to the warrant requirement to apply, both the use of CSLI and the cell site simulator require a belief that someone is in imminent danger or there will be the imminent destruction of evidence. However, the officers are not alleging that evidence was being destroyed, nor that Mr. Taylor would flee. They base their claim of exigent circumstances on a belief that Mr. Taylor was dangerous. Detective Machens testified that he contacted AT&T for the CSLI after officers had attempted to locate Mr. Taylor at two different residences, the morning after he allegedly called the Berkeley Police Department demanding a charger for his location monitoring bracelet.

When officers decided to arrest Mr. Taylor on the morning of January 15, 2020, they were aware of the altercation that had occurred a month prior and of the flourishing that took place six days before the planned arrest. In addition, they knew that a witness had recently come forth with information about Mr. Taylor's involvement in a murder which occurred three months prior. They did not learn about the uncorroborated phone calls to the Berkley Police Department until the morning of the arrest. This timeline establishes that officers had ample opportunity to secure a warrant for Mr. Taylor's cell phone location information before they attempted to locate him. It does not appear that the "exigency" happened until after they failed to locate Mr. Taylor at one of his residences. There is no evidence that officers or other individuals were in imminent danger. Therefore, the government has failed to carry its burden to establish that exigent circumstances justified the use the CSLI or the cell site simulator.

### 3. Exclusion of Evidence

 "Under [the exclusionary] rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561, (1974). This prohibition "reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." *United States v. Hastings*, 685 F.3d 724, 728 (8th Cir. 2012) (internal quotation omitted). The rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Calandara,* 414 U.S. at 348.

Exclusion does not necessarily follow every Fourth Amendment violation, rather, the exclusionary rule is applied in limited circumstances: "those 'unusual cases'" where it may "appreciably deter governmental violations of the Fourth Amendment." *U.S. v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014) (citing *U.S. v. Leon*, 468 U.S. 897, 909, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)); *see also Hudson v. Michigan,* 547 U.S. 586, 591-92, 126 S. Ct. 2159, 2164 (2006) (whether suppression is appropriate is a separate question from whether a defendant's Fourth Amendment rights were violated). In deciding the exclusionary rule's applicability, courts weigh the benefits of the deterrent effect against the social costs of exclusion. *Herring v. United States*, 555 U.S. 135, 141, 129 S. Ct. 695, 700, 172 L. Ed. 2d 496 (2009). Omission of reliable evidence can be one of these costs. *See Davis v. United States*, 564 U.S. 229, 237, 131 S. Ct. 2419, 2427, 180 L. Ed. 2d 285 (2011).

Generally, "the burden of proof is on the defendant who seeks to suppress evidence." *U.S. v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the

burden shifts to the government to show that the search or seizure was reasonable." *Id.* (citation omitted). In other words, where a search or seizure is conducted without a warrant, it is the burden of the government to establish by a preponderance of the evidence that the search was justified. *See United States v. Hughes*, 517 F.3d 1013, 1019 (8th Cir. 2008). That is, the government then must show that the warrantless search falls within "certain reasonable exceptions." *Kentucky v. King*, 563 U.S. at 459.

The "attenuation doctrine," is an exception to the exclusionary rule that applies "when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff,* 579 U.S. 232, 238, 136 S.Ct. 2056, 2061, 195 L.Ed.2d 400 (2016) (quoting *Hudson v. Michigan,* 547 U.S. 586, 593, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006)). "The attenuation doctrine evaluates the causal link between the government's unlawful conduct and the discovery of evidence, which often has nothing to do with a defendant's actions." *Id.*

Here, the Government contends that under *Strieff* Mr. Taylor's arrest on the probation warrant attenuated the connection between the cell phone location data and the evidence seized after Mr. Taylor was located and arrested. The Eighth Circuit Court of Appeals uses a three-part test to determine whether the attenuation doctrine applies. "First, we look to the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Second, we consider the presence of intervening circumstances. Third, and particularly significant, we examine the purpose and flagrancy of the official misconduct." *United States v. Lowry*, 935 F.3d 638, 642–43 (8th Cir. 2019) (quoting *Strieff,* 579 U.S. at 239).

Here, the first factor, temporal proximity between the unlawful search (use of CSLI and CSS) and the stop, favors suppressing the evidence. This factor only favors attenuation when substantial time elapses between an unlawful act and when the evidence is obtained. *Strieff,* 579 U.S. at 239. The unlawful act of the warrantless use of the cell site simulator led to the stop of the vehicle and the discovery of the gun and drug evidence within minutes.

The second factor, the presence of intervening circumstances, favors attenuation. The Government argues that the existence of the arrest warrant for the probation violation was the intervening circumstance. In *Strieff*, the Supreme Court held that a valid, pre-existing arrest warrant could attenuate the link between an unlawful investigatory stop and evidence seized as a result of that stop. *Id.* at 240. There, the officer stopped the defendant without reasonable suspicion and then conducted a warrant check; based on the outstanding warrant he discovered, he arrested the defendant. *Id.* at 235. The drugs at issue were found by the search incident to that arrest. *Id.* at 236. As a result, the causal chain between the officer's illegal action—the initial, unjustified *Terry* stop—and the search was "brok[en]" by the intervening discovery of the warrant. *Id.* at 242. The arrest warrant was "downstream" of the tainting action, and "upstream" of the search.

However, unlike the officer in *Strieff*, the officers here already knew that Mr. Taylor had a warrant for his arrest. Mr. Taylor argues that the probation violation warrant was intimately connected with the search and seizure. In short, the existence of the warrant was not an intervening circumstance, at least in a temporal sense. However, in *United States v. Patrick*, the Seventh Circuit Court of Appeals held that the existence of an arrest warrant precludes suppression of evidence under *Strieff*. 842 F.3d at 542. The majority explained,

> A person wanted on probable cause (and an arrest warrant) who is taken into custody in a public place, where he had no legitimate expectation of privacy, cannot complain about how the police learned his location. Recall that the cell-site simulator (unlike the GPS device in *Jones*) was not used to generate the probable

cause for arrest; probable cause to arrest Patrick predated the effort to locate him. From his perspective, it is all the same whether a paid informant, a jilted lover, police with binoculars, a bartender, a member of a rival gang, a spy trailing his car after it left his driveway, the phone company's cell towers, or a device pretending to be a cell tower, provided location information. A fugitive cannot be picky about how he is run to ground. So it would be inappropriate to use the exclusionary rule, even if the police should have told the judge that they planned to use a cell-site simulator to execute the location warrant.

*Id.* at 545. In the dissenting opinion, Chief Judge Wood acknowledged "I recognize that *Strieff* contains language that could be stretched to suggest that a warrant's existence, regardless of the actual causal chain, is sufficient attenuation." *Id.* at 550 (citing *Strieff,* 579 U.S. at 240).

The third factor, "the purpose and flagrancy of the official misconduct" also favors attenuation. The exclusionary rule exists to deter police misconduct. *Davis v. United States,* 564 U.S. at 236–237. The third factor of the attenuation doctrine reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant. *Strieff*, 579 U.S. at 241. "Application of the exclusionary rule ... does not serve [its] deterrent function when the police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." *United States v. Yorgensen*, 845 F.3d 908, 915 (8th Cir. 2017) (internal quotation omitted). "An unreasonable mistake alone is not sufficient to establish flagrant misconduct." *Id.* (quoting *United States v. Herrera–Gonzalez*, 474 F.3d 1105, 1113 (8th Cir. 2007)).

Det. Machens' use of Cell Site Location Information without a warrant and subsequent request for a cell site simulator could not be considered flagrant because there is no controlling caselaw regarding the need for a warrant prior to the use of those technologies. As discussed *supra*, *Carpenter* applies the Fourth Amendment to *historical* cell site information and neither the Supreme Court nor the Eighth Circuit has opined on the need for a warrant before deploying a cell site simulator.

Mr. Taylor argues that St. Louis County Police Department and Department of Justice policies require a search warrant or judicial authorization before using the CSLI and cell site simulator and the officers' disregard of those policies rises to flagrant official misconduct. Det. Machens requested CSLI believing the situation to be exigent. He also applied for and received a follow-up warrant which a judge found met the probable cause requirement for the cell phone location information. (Exh. 1). While the undersigned has found that exigent circumstances did not exist, it cannot be said that Det. Machens' actions in requesting the exigent pings amounted to flagrant official misconduct.

S/A Davis was subject to Department of Homeland Security policies regarding the use of the cell site simulator. (Exh. E.) The Homeland Security Policy requires that agents, in consultation with prosecutors, seek a warrant before a cell site simulator is used. The policy contains an exigent circumstances exception that S/A Davis relied on when he assisted St. Louis County officers in locating Mr. Taylor. It is clear that S/A Davis did not follow the directive to obtain internal approval prior to using the device. However, S/A Davis testified that he relied on the County officers to obtain the requite approvals. Again, given that S/A Davis relied on St. Louis County officers' belief that there were exigent circumstances present, his behavior did not rise to the level of flagrant official misconduct. Therefore, applying the attenuation doctrine factors, the undersigned recommends that evidence obtained following the use of CSLI and the cell site simulator should not be suppressed.

### 4. Exclusion of Statements

Mr. Taylor contends that the statement he made to officers when he was arrested should be suppressed because he had not been advised of his rights pursuant to *Miranda v. Arizona.* Therefore, he claims his Fifth Amendment right against self-incrimination was violated.

> [W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify

the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 1630, 16 L. Ed. 2d 694 (1966).

When Mr. Taylor was removed from the vehicle in which he was riding, two firearms and drug evidence were found.  When the items were located in the vehicle, Mr. Taylor made the statement, "Ain't nothing in that car that lady's."  (Tr. 24-25.) Agent Cunningham testified that Mr. Taylor was not being questioned when he made that statement, and the police planned to take Mr. Taylor to the homicide unit in Clayton and formally interview him there. *Id.* The evidence here establishes that Mr. Taylor was not being interrogated when he made the statement regarding the guns and drugs. The Eighth Circuit has explained:

Interrogation refers not only to express questioning but also to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. *See Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Interrogation must also reflect a measure of compulsion above and beyond that inherent in custody itself. *See id.* at 300, 100 S.Ct. 1682. Thus, not all statements made while in custody are the product of interrogation. *See United States v. Hatten,* 68 F.3d 257, 262 (8th Cir.1995).

*Holman v. Kemna*, 212 F.3d 413, 418 (8th Cir. 2000).

Here, while Mr. Taylor was in custody when he made the statement, the evidence shows that no interrogation was taking place.   Therefore, there was no violation of Mr. Taylor's Fifth Amendment rights against self-incrimination, and his statements should not be suppressed on this basis.

For the foregoing reasons, the Motion to Suppress Evidence and Statements should be denied.

## IV.    CONCLUSION AND RECOMMENDATION

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Antonio Taylor's Motion to Suppress Evidence and Statements (Doc. 54) should be **DENIED.**

The parties are advised that they have fourteen (14) days in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. *Thompson v. Nix,* 897 F.2d 356, 357 (8th Cir. 1990).

NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of June, 2022.